UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

GREGORY G. SAMPLES,                    CASE NO. 1:07CV247
        PLAINTIFF                      (SPIEGEL, J.)
                                       (HOGAN, M.J.)

        VS.

MICHAEL J. ASTRUE,
COMMISSIONER OF
SOCIAL SECURITY,
        DEFENDANT

## REPORT AND RECOMMENDATION

Plaintiff filed his application for Disability Insurance Benefits in July, 2003. The alleged onset date was August 8, 2002. His application was denied both initially and upon reconsideration. Plaintiff then requested and obtained two hearings before an Administrative Law Judge (ALJ) in Cincinnati, Ohio. The hearings occurred in June, 2005 and January, 2006. Plaintiff testified at both hearings as did Vocational Expert (VE) Janice Bending, Ph.D. A Medical Expert (ME) Dr. Arthur Lorber testified at the hearing in January, 2006. Plaintiff was represented by counsel at both hearings. In June, 2006, the ALJ reached an unfavorable decision, from which Plaintiff processed an appeal to the Appeals Council, and in February, 2007, the Appeals Council denied review. In March, 2007, Plaintiff filed his Complaint with this Court.

## STATEMENTS OF ERROR

Plaintiff asserts that the ALJ made four errors prejudicial to his case. Plaintiff asserts that the ALJ erred by failing to afford controlling weight to Plaintiff's treating mental health physicians. Plaintiff also asserts that the ALJ erred by affording too much weight to the opinion of non-examining medical expert regarding the severity of Plaintiff's physical impairments, and

too little weight to the opinions of Plaintiff's examining and treating physicians.  Plaintiff also claims that the ALJ gave inadequate consideration to Plaintiff's subjective reports of pain and that the ALJ erred by relying on an improper hypothetical question to the Vocational Expert.

## PLAINTIFF'S TESTIMONY AT THE HEARINGS

Unlike most hearings, the initial testimony dealt with Plaintiff's income from collateral sources.  Plaintiff testified that he had received unemployment compensation benefits in 2003, as well as certain benefits from the Carpenter's Union, for whom he worked for 25 years.  After those benefits ceased, Plaintiff attempted to secure employment with Lowe's and Rapid Delivery, but he was unable to assist the driver in loading and unloading the truck and the employers were concerned about the status of Plaintiff's health.  Ultimately, Plaintiff began to liquidate assets in order to meet expenses.  He sold a rental duplex, returned his truck to the dealer and sold an Impala SuperSport to a "guy in California."  Plaintiff estimated that he has sold approximately $100,000 in assets to meet living expenses in the past few years.  Plaintiff's wife is employed and Plaintiff is covered  under his wife's medical policy.  Plaintiff did primarily drywall work and frequently lifted 50 lbs.  He then advanced to the job of foreman, which was supervisory.

Plaintiff underwent neck surgery in October, 2002 by P. Robert Schwetschenau, M.D.  At the time, he was working for OKI Interiors and earning $40,000 per year.  The surgery eliminated neck pain, but left him with considerable loss of range of motion and an inability to look either up or down.  Before his neck problems developed, Plaintiff had a preexisting problem with his lower back, for which he was treated with steroidal injections by Dr. Sudarshan, a pain specialist. (Tr. 312 -323).

Plaintiff also related that he was treated by Dr. Merchant for depression and that he obtained the referral to see Dr. Merchant, a clinical psychologist, from Dr. Desai, his family doctor.  He takes prescribed drugs like Effexor, Xanax and Remeron.  The side effects are increased sweating, light-headedness and weight gain.  He also takes pain medications, Percocet and Baclafin.  Plaintiff described his pain severity as "seven to eight constantly."  He has had physical therapy both at home and at a facility.

2

Plaintiff testified that he spends his time driving his golf cart around his 5-acre plot and talking on his HAM radio. On occasion, he can do laundry and put the dishes in the dishwasher. He feels indebted to his wife and family and wants to avoid being a burden. He estimated that he could sit for one hour at a time and could also stand for that period if he could move around. He reclines for two or three hours per day. His medicines sometimes make him drowsy. (Tr. 323-339.

At the second hearing in January, 2006, Plaintiff testified that his medical condition had gotten worse. He told of an incident where his left leg went numb and he fell down the steps. Plaintiff related that he hasn't worked for three years and never missed a day for 30 years prior to the injury to his back and neck. (Tr. 351-357). He specialized in the installation of acoustic ceilings.

## THE VOCATIONAL EXPERT AND THE HYPOTHETICAL QUESTION

The ALJ asked the VE a series of hypothetical questions, the first of which asked her to assume that Plaintiff could lift, carry push or pull up to 20 lbs. occasionally and up to 10 lbs. frequently. Plaintiff could stand and walk for 6 hours and sit for 6 hours, but could not perform overhead work nor perform work which requires repetitive looking up or down. Plaintiff could not crawl, nor climb ramps, ladders or ropes. Plaintiff should avoid heavy vibration, but could work at a medium pace and should avoid quotas and assembly line work. Plaintiff could not work in a teamwork-type atmosphere and is limited to repetitive and routine tasks in a stable work environment with little or no change. Plaintiff could understand and carry out simple instructions, but must have no contact with the general public and only occasional contact with co-workers. The VE responded that Plaintiff could not return to his past relevant work, but could perform a representative number of light and unskilled jobs as a hand packager.

The second hypothetical asked the VE to assume all the physical limitations of the first hypothetical, but eliminate the psychological limitations. The VE responded that Plaintiff could perform a representative number of light level jobs, such as receptionist, information clerk and general office worker.

The third hypothetical question was based on the residual functional capacity assessment

3

prepared by Dr. Merchant, the clinical psychologist. The VE responded that if Dr. Merchant's report was accurate, Plaintiff would be unemployable. (Tr. 371-384).

The VE also conceded that were Plaintiff to miss about 3 days per month, he would be unemployable. (Tr. 336-348, 382).

## THE TESTIMONY OF THE MEDICAL EXPERT

Arthur Lorber, M.D. is a board certified orthopaedic surgeon. Dr. Lorber reviewed the medical information and stated that Plaintiff had an MRI, which showed a "disc protrusion which abutted the chord at the C5-6 level. He then underwent surgery, an anterior discectomy and fusion at the C6-7 level. Dr. Lorber also testified that Plaintiff had an MRI which showed a bulge in the lumbar spine. He was found to be "neurologically intact, but a diagnosis of left-sided neuralgia paresthetic, which involves the femoral lateral cutaneous nerve, a superficial sensory only nerve" was made. An MRI showed a "left-sided foraminal protrusion at the L3-4 level, but a later MRI showed "no evidence of a protrusion at the L3-4 level. Dr. Lorber opined that Plaintiff did not meet or equal Listing 1.04 (A)(B) or (C), but he would limit Plaintiff, because of his cervical impairment, to lifting 20 lbs. occasionally and 10 lbs. frequently, limit him to intermittent standing/walking to 6 hours in a workday and also limit him for intermittent sitting to 6 hours per day. Dr. Lorber would preclude overhead work with either arm and would also preclude any work that would require Plaintiff to look up on a significant portion of the day. Dr. Lorber would impose no restrictions because of Plaintiff's lumbar impairment.

Dr. Lorber saw no significant changes between the MRIs taken in August, 2001 and March, 2005. Dr. Lorber defined a "herniation" as a severe degree of bulge and pointed out that herniations near the foramen would have greater significance than if they occurred elsewhere and that should an MRI show foraminal stenosis abutting a nerve root, one would expect to see limitations. Were the nerve root to be compressed, symptomatology would be certain. Dr. Lorber stated that clinical examination after Plaintiff's surgery "revealed no evidence of focal neurologic deficit."

Dr. Lorber would preclude crawling, excess vibration and climbing ladders, scaffolds and

4

ropes, but he would not preclude looking down for long periods of time or looking from side to side. (Tr. 358-371).

## THE DECISION OF THE ADMINISTRATIVE LAW JUDGE

The ALJ found that Plaintiff suffers from degenerative disc disease and depression and that each is a severe impairment. The ALJ also found that Plaintiff's degenerative disc disease does not meet or equal Listing 1.04, nor does Plaintiff's depression meet or equal Listing 12.04. The ALJ found that Plaintiff has the residual functional capacity as indicated in the first hypothetical question and can perform a limited, called "significant" by the ALJ, range of light work.

## MEDICAL RECORD

In August, 2001, Plaintiff had an MRI of the lumbar spine at Medical Imaging in Cincinnati. The report indicated that "At L3-4, there is a diffuse posterior disc bulge. There is mild bilateral facet hypertrophy. At L4-5, there is mild bilateral facet hypertrophy. No disc herniations or impingement of the neural structures is seen." (Tr. 118). In September, 2002, Plaintiff underwent a second MRI at the same facility. The report indicated Plaintiff's complaint was "neck pain radiating into the left shoulder." The MRI showed a "moderate sized left paracentral and foraminal disc herniation at C6-7. There is mild to moderate canal compromise, greater to the left and moderate to severe compromise of the left C7 foramen." (Tr. 119-120). A third MRI of the lumbar spine was done in February, 2003 at the same facility. The conclusion was as follows: "L3-L4 diffuse bulge with superimposed left foraminal protrusion. However, no direct impingement on the existing left L3 nerve root is visualized. L4-L5 posterior disc bulge, but no focal herniation or impingement of neural structures is visualized." (Tr. 121-122).

In October, 2002, Plaintiff saw P. Robert Schwetschenau, M.D., a neurosurgeon, of Riverhills Healthcare, Inc. and reported that 2 months previously, he woke up with a stiff neck that subsequently extended to his left shoulder and down his left arm to his hand. The left arm

was reported to be weak. He reported that Percocet helped, but that nonsteroidals, muscle relaxants and Vicodin did not. The MRI showed a disc herniation at C6-7, but no muscle weakness or sensory loss. Plaintiff was reported to be in severe pain. Surgery was recommended and the herniation was later referred to as "huge." (Tr. 141-142 and 146). Dr. Schwetschenau reported in December, 2002 that after the passage of 4 and ½ weeks since surgery was accomplished, Plaintiff was "doing great," had good range of motion in the neck and no sensory or muscle weakness. (Tr. 144). An x-ray of the cervical spine in February, 2003 showed "post-surgical changes (anterior screw and plate internal fixation of the bodies of C6-7 with satisfactory aligned bone plug)" and "moderate anterior spurring at C4-5." (Tr. 145).

Also in February, 2003, Plaintiff returned to Riverhills with complaints of low back and left leg pain. An MRI showed a disc bulge at L3-4 and a mild bulge at L4-5. The MRI report indicated that the degree of impingement was "minimal" and the prescribed treatment was steroids. A 50 lb. lifting restriction was imposed and a restriction against overhead work because of his cervical repair. (Tr. 146-147).

Dr. Schwetschenau referred Plaintiff to Cincinnati Pain Management Consultants. He was treated with various medications, such as Effexor, Celexa, Vicodin, Percocet, Allegra and Zonegran. It was at Fairfield Medical Group that Doctors first noticed signs of depression. (Tr. 148-159).

In October, 2002, X-rays of he cervical spine showed "moderate degenerative changes at C4-5 and mild degenerative changes at C5-6." (Tr. 161). Also in October, 2002, Plaintiff underwent surgery, an anterior cervical discectomy at C6-7, anterior cervical fusion at C6-7, and anterior skeletal fixation at C6-7 with plates and screws. Surgery was prompted by "several weeks of excruciating left arm pain" that did not improve with conservative care. Post-operative care required the use of a collar. (Tr. 162-163). The surgery was performed by Dr. Schwetschenau.

In June, 2003, Gururau Sudarshan, M.D. performed a steroid (Depo-Medrol and Lidocaine) injection at the left L3-4 after a diagnosis of L3-4 foraminal disc herniation. (Tr.168-169). A second injection was performed in July, 2003. (Tr. 170-172). A third epidural steroid injection was performed in January, 2004. (Tr. 173-175). In May, 2003, Dr. Sudarshan reported

to Dr. Schwetschenau that Plaintiff suffered from "moderate to severe" low back pain and left leg pain. He had a cervical fusion at C6-7 in October, 2002 and now has "a significant L3-4 left foraminal disc herniation and a moderate degree of degenerative disc disease affecting L3-4." Dr. Sudarshan's treatment plan included epidural steroidal injections, neurologics and short-acting opioids and physical therapy. (Tr. 177-178).

In August, 2003, Craig Losekamp, M.D. reported that Plaintiff's back pain started in 1999 after he moved a refrigerator. The tenderness is maximum at L3-L4. There is no motor deficit, but sensation is decreased over the left lateral leg ranging from the hip to the knee. There is limited motion in the joints and spine secondary to pain. "The intensity and persistence of the symptoms is unusual" for the examinations and radiographic studies." Dr. Losekamp treated Plaintiff from July, 2001 to July, 2003. (Tr. 179-180).

Plaintiff was evaluated by Richard Sexton, a clinical psychologist, in October, 2003. His chief complaint was "significant neck pain" and an inability to look up. Dr. Sexton diagnosed Plaintiff with Dysthymic Disorder and Somatoform Disorder and assigned a GAF of 58-62. Dr. Sexton rated Plaintiff's intelligence as "low average" and felt he was suffering from depression, which affected his appetite, ability to sleep and energy level. His depression was exacerbated by his inability to return to work as a carpenter. Dr. Sexton opined that Plaintiff was capable of performing simple repetitive tasks and could understand, recall and carry out simple instructions, He would have a fair ability to interact with co-workers and supervisors and a fair ability to tolerate workplace stress and pressure. (Tr. 181-184).

A psychiatric residual functional capacity assessment was made in August, 2002 by Michael Wagner, Ph.D., a clinical psychologist. Dr. Wagner diagnosed Plaintiff with Dysthymic Disorder and Somatoform Disorder. He opined that Plaintiff would have "mild" limitations of his ability to perform the activities of daily living, maintaining social function and maintain concentration, persistence or pace. Dr. Wagner's notes indicate the following:

> "Claimant alleges depression. He is on medication. He is able to
> relate to others. He socializes with friends about once a month.
> He is able to maintain concentration and attention as shown by
> his ability to remember 5 digits forward and 4 backward. He was

> able to perform serial 3s.  He is able to tolerate daily stress of
> work.  He is diagnosed with Dysthymic Disorder and Somatoform
> Disorder Nos."

(Tr. 186-198).

A physical residual functional capacity assessment was done by Willa Caldwell, M.D. in December, 2003.  Dr. Caldwell's opinion was that Plaintiff could lift 20 lbs. occasionally and 10 lbs. frequently, could stand/walk for 6 hours in a workday and sit for 6 hours.  He could occasionally climb ramps and stairs, but should never climb ladders, ropes or scaffolds.  He could frequently balance and occasionally stoop and/or crouch.  Dr. Caldwell's notes indicate the following:

> "Claimant alleges degenerative disc disease.  He states that he
> cannot sit or walk for long periods.  A 2/03 MRI showed
> desiccation at L3-4, diffuse disc bulge and protrusions.
> At L4-5, there is desiccation and mild diffuse posterior
> bulge.  He has no motor deficit.  Sensation is decreased
> over left lateral leg from hip to knee.  He has decreased
> ROM (range of motion).  Gait is stiff, but not antalgic
> and does not require ambulatory aid."

(Tr. 199-203).

Plaintiff saw Rebecca Koehl, M.D. in October, 2003 for depression.  She increased his prescription for Effexor. (Tr. 204).

Dr. Sudarshan completed an Arthritis Residual Functional Capacity Questionnaire in February, 2004.  Dr. Sudarshan has treated Plaintiff since May, 2003.  The diagnosis was L3-4 left foraminal disc and neck pain resulting from a fusion at C6-7.  His symptoms are neck pain and low back and left leg pain.  Dr. Sudarshan indicated that Plaintiff has a reduced range of motion in the cervical and lumbar spine, sensory changes, and abnormal posture.  He did not feel that emotional factors contributed to his patient's symptoms.  Dr. Sudarshan indicated that Plaintiff's symptoms would frequently interfere with the attention and concentration needed to perform simple work tasks, but he would be able to perform low- stress jobs.

8

Dr. Sudarshan opined that Plaintiff could walk two blocks, sit for 30 minutes at a time and stand for 30 minutes at a time. Plaintiff could sit and stand/walk for less than 2 hours in a workday. He would need a job which would allow him to shift positions and would need to take a 10-15 minute break every 15 to 30 minutes. He could frequently lift less than 10 lbs., occasionally lift 10 lbs. and never lift 20 lbs. or more. He should never twist or crouch, but could rarely stoop or climb ladders. He could occasionally climb stairs. He would miss about 4 days per month because of his impairments or treatment for them. (Tr. 206-209).

Plaintiff again saw Dr. Schwetschenau in March, 2004. Plaintiff reported at that time that he had undergone 5 epidural spinal injections and that each relieved his back pain for a few weeks. He had never returned to work following his cervical surgery. Dr. Schwetschenau could find nothing wrong with Plaintiff's neurologic examination. He had normal leg strength, but decreased sensation over the anterolateral thigh to just above the knee. (Tr. 224).

A Psychiatric Evaluation Form was completed in February, 2005 by Amanda Merchant, Ph.D., a clinical psychologist. Dr. Merchant said that she has treated with Plaintiff on a biweekly to monthly basis since February, 2004. Her diagnosis was Major Depressive Disorder and Anxiety Disorder. His symptoms are anhedonia, sleep disturbance, psychomotor agitation, decreased energy, feelings of guilt or worthlessness, difficulty concentrating or thinking and thoughts of suicide. Dr. Merchant felt that Plaintiff had a moderate impairment in planning daily activities and holding a job. She rated as "marked or extreme" Plaintiff's difficulty in concentrating and persisting. She rated as "marked or extreme" Plaintiff's difficulty sustaining tasks and completing tasks in a timely manner. (Tr. 226-232).

Also in February, 2005, Dr. Merchant completed a Mental Impairment Questionnaire after she had seen Plaintiff 13 times. She assigned a GAF of 62, said that Plaintiff's prognosis was "guarded" and opined that Plaintiff's reduced attention and concentration was due to his depression. Dr. Merchant added to Plaintiff's list of symptoms a flat affect, generalized persistent anxiety, mood disturbance, apprehension expectation and emotional withdrawal. In a category called "Unable to meet competitive standards" in relation to unskilled work, Dr. Merchant listed Plaintiff's inability to remember work-like procedures, maintain attention for a two-hour segment, maintain regular attendance, sustain an ordinary routine without special

9

supervision, complete a normal workday without interruptions from psychologically-based symptoms, perform at a consistent pace without an unreasonable number of rest periods, respond appropriately to changes in the work setting and deal with normal work stress. In a category called "Seriously limited but not precluded," Dr. Merchant listed Plaintiff's inability to understand, remember and carry out simple instructions, work in proximity to others without being distracted, make simple work-related decisions, ask simple questions, accept instructions and respond appropriately to criticism, get along with co-workers and be aware of normal hazards. With regard to Plaintiff's ability to perform semi-skilled or skilled work, Dr. Merchant opined that Plaintiff was "unable to meet competitive standards" in all four areas listed. Finally, Dr. Merchant considered Plaintiff's impairments in terms of his ability to function and rated Plaintiff deficiencies as "marked" for his ability to perform the activities of daily living, difficulty maintaining social function and difficulty maintaining concentration, persistence and pace." (Tr., Pgs. 233-243).

Plaintiff was evaluated by Ron Koppenhoefer, M.D. in May, 2005. Plaintiff told Dr. Koppenhoefer that his neck pain began in 2002 "when he developed a sudden onset of pain and stiffness. In October, 2002, Dr. Schwetschenau performed an anterior cervical fusion. The pain receded, but the stiffness continued after surgery. Plaintiff told Dr. Koppenhoefer that his low back pain started in 2002 after moving a refrigerator. He was treated with physical therapy, five epidural injections and medications called Percocet and Baclofen. His primary care physician has prescribed Effexor, Remeron and Xanax for depression. Dr. Koppenhoefer concluded, after examining Plaintiff and reviewing his medical records, that he meets Listing 1.04 for disorders of the cervical spine. "It was noted that he does have a fusion of the C6-7 level and has a documented disc protrusion at the C5-6 level which is causing some degree of impingement on the chord, according to the MRI study. I believe his condition is similar to this Listing, but does not have the motor loss or the accompanied sensory reflex change, but he has the same limitations of function as this Listing implies at this time. His low back condition would prevent him from doing activities which would require repetitive bending, stooping or lifting. His cervical spine would preclude him from doing static activities involving the cervical spine as well as rotational movements and extension or flexion of the cervical spine."

Dr. Koppenhoefer stated that depression contributes to the severity of Plaintiff's symptoms, that his impairments are reasonably consistent with his functional limitations, and that his pain would frequently interfere with his ability to attend and concentrate on the job. Dr. Koppenhoefer stated that Plaintiff is "incapable of even low stress jobs," that he could sit for 30 minutes at a time and stand for 30 minutes at a time. Plaintiff could sit for a total of 6 hours in a workday and stand/walk for about 4 hours. The doctor said that Plaintiff would require shifting of positions at will and that he would need to take unscheduled breaks to lie down. Dr. Koppenhoefer opined that Plaintiff should never lift 50 lbs., but that he could rarely lift 20 lbs. He could occasionally twist, stoop, crouch, climb ladders and stairs, but could rarely look down, flex his neck, look up, hold his head in a static position or turn his head. In the doctor's opinion, Plaintiff would miss about 3 days per month because of his impairments or treatment for them. (Tr. 250-259).

An MRI of the spine taken in March, 2005 at Fort Hamilton Hospital showed "prominent epidural veins at L5-S1 level" and an "annular bulge at L4-5 and L3-4" (Tr. 268). In March, 2004, Dr. Schwetschenau imposed a 10 lb. lifting restriction upon Plaintiff. (Tr. 278).

In July, 2005, Plaintiff was examined by Kevin Eggerman, M.D., a psychiatrist. Dr. Eggerman reported that Plaintiff's chief complaint was lower back pain. Plaintiff told Dr. Eggerman about the decreased range of motion in his neck and the low back pain which radiates down his left leg. He related that therapy with Dr. Merchant had been helpful as have the medications called Effexor and Remeron. Dr. Eggerman diagnosed Plaintiff with a depressive disorder and assigned a GAF of 60. Dr. Eggerman felt that Plaintiff's psychological symptoms were "largely in remission" and that his prognosis was "fair." Dr. Eggerman opined that Plaintiff's ability to understand, remember and carry our short and simple instructions was "minimally limited," that his ability to understand, remember and carry out detailed instructions was mildly limited. Dr. Eggerman found a moderate limitation of Plaintiff's ability to respond to workplace pressure, but a mild limitation with respect to Plaintiff's ability to interact appropriately with the public and his ability to respond to changes in a routine work setting. (Tr. 285-292).

11

**OPINION**

The following principles of law control resolution of the issues raised in this case. Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g). The Court's sole function is to determine whether the record as a whole contains substantial evidence to support the Commissioner's decision. The Commissioner's findings stand if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). In deciding whether the Commissioner's findings are supported by substantial evidence, the Court must consider the record as a whole. *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978).

To qualify for disability insurance benefits, plaintiff must meet certain insured status requirements, be under age 65, file an application for such benefits, and be under a disability as defined by the Social Security Act. 42 U.S.C. §§ 416(I), 423. Establishment of a disability is contingent upon two findings. First, plaintiff must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 423(d)(1)(A). Second, the impairments must render plaintiff unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy. 42 U.S.C. § 423(d)(2).

Regulations promulgated by the Commissioner establish a sequential evaluation process for disability determinations. 20 C.F.R. § 404.1520. First, the Commissioner determines whether the individual is currently engaging in substantial gainful activity; if so, a finding of nondisability is made and the inquiry ends. Second, if the individual is not currently engaged in substantial gainful activity, the Commissioner must determine whether the individual has a severe impairment or combination of impairments; if not, then a finding of nondisability is made and the inquiry ends. Third, if the individual has a severe impairment, the Commissioner must compare it to those in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1. If the impairment meets or equals any within the Listing, disability is presumed and benefits are awarded. 20 C.F.R. § 404.1520(d). Fourth, if the individual's impairments do not meet or equal those in the Listing, the

12

Commissioner must determine whether the impairments prevent the performance of the individual's regular previous employment. If the individual is unable to perform the relevant past work, then a prima facie case of disability is established and the burden of going forward with the evidence shifts to the Commissioner to show that there is work in the national economy which the individual can perform. *Lashley v. Secretary of H.H.S.*, 708 F.2d 1048 (6th Cir. 1983); *Kirk v. Secretary of H.H.S.*, 667 F.2d 524 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983).

The grid is designed for use when the alleged impairment manifests itself through limitations in meeting the strength requirements of jobs. 20 C.F.R. Subpart P, Appendix 2, § 200.00(e). If plaintiff suffers solely from nonexertional impairments, the grid is inapplicable and the Commissioner must rely on other evidence to rebut plaintiff's prima facie case of disability. *Id.*, § 200.00(e)(1). Nonexertional impairments include "certain mental, sensory, [and] skin impairments" as well as "postural and manipulative limitations [and] environmental restrictions." 20 C.F.R. Subpart P, Appendix 2, § 200.00(e). Where a plaintiff suffers from an impairment or a combination of impairments that results in both exertional and nonexertional limitations, the grid is consulted to see if a finding of disability is directed based upon the strength limitations alone. If not, the grid is then used as a framework and the Commissioner examines whether the nonexertional limitations further diminish plaintiff's work capability and preclude any types of jobs. *Id.*, § 200.00(e)(2). If an individual suffers from a nonexertional impairment that restricts performance of a full range of work at the appropriate residual functional capacity level, the Commissioner may use the grid as a framework for a decision, but must rely on other evidence to carry his burden. *Abbott v. Sullivan*, 905 F.2d 918, 926-27 (6th Cir. 1990); *Damron v. Secretary of H.H.S.*, 778 F.2d 279, 282 (6th Cir. 1985); *Kirk v. Secretary of H.H.S.*, 667 F.2d 524, 528-29 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983). The existence of a minor nonexertional impairment is insufficient to preclude use of the grid for directing a decision. Rather, plaintiff must demonstrate that the nonexertional impairment "significantly limits" his ability to do a full range of work at the appropriate exertional level in order to preclude a grid based decision. *Atterberry v. Secretary of H.H.S.*, 871 F.2d 567, 572 (6th Cir. 1989); *Cole v. Secretary of H.H.S.*, 820 F.2d 768, 771-72 (6th Cir. 1987); *Kimbrough v. Secretary of H.H.S.*, 801 F.2d 794, 796 (6th Cir. 1986).

When the grid is not applicable, the Commissioner must make more than a generalized

13

finding that work is available in the national economy; there must be "a finding supported by substantial evidence that a claimant has the vocational qualifications to perform *specific* jobs." *Richardson v. Secretary of H.H.S.*, 735 F.2d 962, 964 (6th Cir. 1984) (per curiam) (emphasis in original); *O'Banner v. Secretary of H.E.W.*, 587 F.2d 321, 323 (6th Cir. 1978). Taking notice of job availability and requirements is disfavored. *Kirk v. Secretary of H.H.S.*, 667 F.2d 524, 536-37 n.7, 540 n.9 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983). There must be more than mere intuition or conjecture by the ALJ that the claimant can perform specific jobs in the national economy. *Richardson*, 735 F.2d at 964; *Kirk*, 667 F.2d at 536-37 n.7. The Commissioner is not permitted to equate the existence of certain work with plaintiff's capacity for such work on the basis of the Commissioner's own opinion. This crucial gap is bridged only through specific proof of plaintiff's individual capacity, as well as proof of the requirements of the relevant jobs. *Phillips v. Harris*, 488 F. Supp. 1161 (W.D. Va. 1980)(citing *Taylor v. Weinberger,* 512 F.2d 664 (4th Cir. 1975)). When the grid is inapplicable, the testimony of a vocational expert is required to show the availability of jobs that plaintiff can perform. *Born v. Secretary of H.H.S.,* 923 F.2d 1168, 1174 (6th Cir. 1990); *Varley v. Secretary of H.H.S.*, 820 F.2d 777, 779 (6th Cir. 1987).

The assumptions contained in an ALJ's hypothetical question to a vocational expert must be supported by some evidence in the record. *Hardaway v. Secretary of H.H.S.*, 823 F.2d 922, 927-28 (6th Cir. 1987). A proper hypothetical question should accurately describe plaintiff "in all significant, relevant respects; for a response to a hypothetical question to constitute substantial evidence, each element of the hypothetical must accurately describe the claimant." *Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994). *See also Varley v. Secretary of H.H.S.*, 820 F.2d 777, 779 (6th Cir. 1987). Where the evidence supports plaintiff's allegations of pain, a response to a hypothetical question that omits any consideration of plaintiff's pain and its effects is of "little if any evidentiary value." *Noe v. Weinberger*, 512 F.2d 588, 596 (6th Cir. 1975). However, "the ALJ is not obliged to incorporate unsubstantiated complaints into his hypotheticals." *Stanley v. Secretary of H.H.S.*, 39 F.3d 115, 118 (6th Cir. 1994).

Pain alone, if the result of a medical impairment, may be severe enough to constitute disability. *Kirk v. Secretary of H.H.S.,* 667 F.2d 524, 538 (6th Cir. 1981), *cert. denied,* 461 U.S. 957 (1983). In order to find plaintiff disabled on the basis of pain alone, the Commissioner must

14

first determine whether there is objective medical evidence of an underlying medical condition. If there is, the Commissioner must then determine: (1) whether the objective medical evidence confirms the severity of pain alleged by plaintiff; or (2) whether the underlying medical impairment is severe enough that it can reasonably be expected to produce the allegedly disabling pain. *Duncan v. Secretary of H.H.S.*, 801 F.2d 847, 852-53 (6th Cir. 1986). *See also Felisky v. Bowen*, 35 F.3d 1027, 1038-39 (6th Cir. 1994); *Jones v. Secretary of H.H.S.*, 945 F.2d 1365, 1369 (6th Cir. 1991). This test, however, "does not require . . . 'objective evidence of the pain itself.'" *Duncan*, 801 F.2d at 853. Where a complaint of pain is not fully supported by objective medical findings, the Commissioner should consider the frequency and duration of pain, as well as other precipitating factors including the effect of the pain upon plaintiff's activities, the effect of plaintiff's medications and other treatments for pain, and the recorded observations of pain by plaintiff's physicians. *Felisky*, 35 F.3d at 1039-40.

Where the medical evidence is consistent, and supports plaintiff's complaints of the existence and severity of pain, the ALJ may not discredit plaintiff's testimony and deny benefits. *King v. Heckler*, 742 F.2d 968, 975 (6th Cir. 1984). Where, however, the medical evidence conflicts, and there is substantial evidence supporting and opposing a finding of disability, the Commissioner's resolution of the conflict will not be disturbed by the Court. *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983) (per curiam). In either event, the ALJ must articulate, on the record, his evaluation of the evidence and how it relates to the factors listed above. *Felisky*, 35 F.3d at 1039-41.

In light of the Commissioner's opportunity to observe the individual's demeanor, the Commissioner's credibility finding is entitled to deference and should not be discarded lightly. *Kirk*, 667 F.2d at 538. "If an ALJ rejects a claimant's testimony as incredible, he must clearly state his reasons for doing so." *Felisky,* 35 F.3d at 1036. The ALJ's articulation of reasons for crediting or rejecting a claimant's testimony must be explicit and "is absolutely essential for meaningful appellate review." *Hurst v. Sec. of H.H.S.*, 753 F.2d 517, 519 (6th Cir. 1985)(citing *Zblewski v. Schweiker*, 732 F.2d 75, 78 (7th Cir. 1984)).

A treating physician's opinion is entitled to weight substantially greater than that of a nonexamining medical advisor or a physician who saw plaintiff only once. *Harris v. Heckler*,

756 F.2d 431, 435 (6th Cir. 1985); *Lashley v. Secretary of H.H.S.,* 708 F.2d 1048, 1054 (6th Cir. 1983). A summary by an attending physician made over a period of time need not be accompanied by a description of the specific tests in order to be regarded as credible and substantial. *Cornett v. Califano,* No. C-1-78-433 (S.D. Ohio Feb. 7, 1979) (LEXIS, Genfed library, Dist. file). A physician's statement that plaintiff is disabled is not determinative of the ultimate issue. *King v. Heckler,* 742 F.2d 968, 973 (6th Cir. 1984). The weight given a treating physician's opinion on the nature and severity of impairments depends on whether it is supported by sufficient medical data and is consistent with other evidence in the record. 20 C.F.R. § 404.1527(d); *Harris v. Heckler,* 756 F.2d 431 (6th Cir. 1985). If not contradicted by any substantial evidence, a treating physician's medical opinions and diagnoses are afforded complete deference. *Harris,* 756 F.2d at 435. *See also Cohen v. Secretary of H.H.S.,* 964 F.2d 524, 528 (6th Cir. 1992). While the Commissioner may have expertise in some matters, this expertise cannot supplant the medical expert. *Hall v. Celebrezze,* 314 F.2d 686, 690 (6th Cir. 1963); *Lachey v. Secretary of H.H.S.,* 508 F. Supp. 726, 730 (S.D. Ohio 1981).

It is the Commissioner's function to resolve conflicts in the medical evidence and to determine issues of credibility. *Felisky v. Bowen,* 35 F.3d 1027, 1036 (6th Cir. 1994); *Hardaway v. Secretary of H.H.S.,* 823 F.2d 922, 928 (6th Cir. 1987); *King v. Heckler,* 742 F.2d 968, 974 (6th Cir. 1984). The Commissioner's determination must stand if it is supported by substantial evidence regardless of whether the reviewing court would resolve the conflicts in the evidence differently. *Kinsella v. Schweiker,* 708 F.2d 1058, 1059 (6th Cir. 1983). *See also Boyle v. Sullivan,* 998 F.2d 342, 347 (6th Cir. 1993); *Tyra v. Secretary of H.H.S.,* 896 F.2d 1024, 1028 (6th Cir. 1990). The Commissioner must state not only the evidence considered which supports the conclusion but must also give some indication of the evidence rejected in order to facilitate meaningful judicial review. *Hurst v. Secretary of H.H.S.,* 753 F.2d 517, 519 (6th Cir. 1985). *See also Shelman v. Heckle*r, 821 F.2d 316, 321 (6th Cir. 1987).

If the Commissioner's decision is not supported by substantial evidence, the Court must decide whether to reverse and remand the matter for rehearing or to reverse and order benefits granted. The Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing." 42 U.S.C. § 405(g); *Melkonyan v. Sullivan,* 111

16

S. Ct. 2157, 2163 (1991).

Where the Commissioner has erroneously determined that an individual is not disabled at steps one through four of the sequential evaluation, remand is often appropriate so that the sequential evaluation may be continued. *DeGrande v. Secretary of H.H.S.*, 892 F.2d 1043 (6th Cir. Jan. 2, 1990) (unpublished, available on Westlaw). Remand is also appropriate if the Commissioner applied an erroneous principle of law, failed to consider certain evidence, failed to consider the combined effect of impairments, or failed to make a credibility finding. *Faucher v. Secretary of H.H.S.*, 17 F.3d 171, 176 (6th Cir. 1994). Remand ordered after a hearing on the merits and in connection with an entry of judgment does not require a finding that the Commissioner had good cause for failure to present evidence at the prior administrative hearing. *Faucher*, 17 F.3d at 173.

Benefits may be immediately awarded "only if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits." *Faucher,* 17 F.3d at 176. *See also Abbott v. Sullivan*, 905 F.2d 918, 927 (6th Cir. 1990); *Varley v. Secretary of Health and Human Services*, 820 F.2d 777, 782 (6th Cir. 1987). The Court may award benefits where the proof of disability is strong and opposing evidence is lacking in substance, so that remand would merely involve the presentation of cumulative evidence, or where the proof of disability is overwhelming. *Faucher*, 17 F.3d at 176. *See also Felisky v. Bowen*, 35 F.3d 1027, 1041 (6th Cir. 1994); *Mowery v. Heckler,* 771 F.2d 966, 973 (6th Cir. 1985).

Plaintiff asserts initially that the ALJ erred by giving more weight to the opinion of Dr. Eggerman, an examining, but non-treating psychiatrist, than to the opinion of Dr. Merchant, a treating psychologist. Plaintiff's medical record also includes opinions by Dr. Richard Sexton, an examining, but non-treating psychologist, Dr. Michael Wagner, a non-examining and non-treating psychologist and to a lesser extent, Dr. Rebecca Koehl, who diagnosed Plaintiff with depression and increased his dosage of Effexor, a medication used to treat depression.

First, let us explore the areas in which the mental health professionals agree. Both Drs. Sexton and Wagner diagnosed Plaintiff with Dysthymic Disorder and Somatoform Disorder. According to The Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, the essential feature of Dysthymic Disorder is a chronically depressed mood that occurs for most of

17

the day, more days than not, for at least two years. A common feature of Somatoform Disorder is the presence of physical symptoms that suggest a general medical condition and are not fully explained by a general medical condition, in other words, unexplained physical complaints.

Dr. Merchant diagnosed plaintiff with Major Depressive Disorder and Anxiety Disorder and Dr. Eggerman agreed that Plaintiff suffered from depression. Thus all the mental health professionals agree that Plaintiff suffers from depression. The disagreement is over the functional limitations resulting from Plaintiff's depression.

Dr. Sexton felt that despite Plaintiff's depression, his ability to interact with co-workers and supervisors was fair as was his ability to tolerate workplace stress and pressure. Dr. Sexton felt that either Plaintiff's depression and/or low average intelligence would not prevent him from understanding, remembering and carrying out simple instructions and that therefore, he could perform simple repetitive tasks. Dr. Wagner found that Plaintiff could relate to others and was able to tolerate workplace stress. Dr. Wagner found that Plaintiff was able to maintain attention and concentration. Dr. Eggerman essentially agreed with Drs. Sexton and Wagner that Plaintiff had only a mild limitation of his ability to interact with the public. Dr. Eggerman agreed with Dr. Sexton that Plaintiff's ability to tolerate workplace stress was not marked or severe and that Plaintiff could understand, remember and carry out simple instructions. Dr. Eggerman seemed to somewhat disagree with Drs. Sexton and Wagner relative to his opinion that Plaintiff's psychological symptoms were "largely in remission," a finding which neither Dr. Sexton or Dr. Wagner made.

These evaluations stand in sharp contrast to the opinion of Dr. Merchant, who admittedly had far more contact with Plaintiff than any of the above individually or collectively. Dr. Merchant saw Plaintiff a total of 16 times over the period from February 23, 2004 to June 10, 2005. The strongest factors in support of this Statement of Error are that Dr. Merchant holds a Ph.D. in clinical psychology and that she has a longitudinal record of familiarity with Plaintiff and his emotional problems. However, the ALJ was clearly perplexed as he states in his opinion, by Dr. Merchant's assignment of a GAF (global assessment of functioning) of 62, a rating used to describe mild symptomatology and a rating very much in line with the GAF of 58-62 assigned by Dr. Sexton and a GAF of 60 assigned by Dr. Eggerman, although the latter two mental health

professionals rated Plaintiff's symptoms in the moderate range. The point is that nobody assigned a GAF in the serious or marked category.

On the other hand, Dr. Merchant's opinion was that Plaintiff had marked limitations of his ability to perform the activities of daily living, marked difficulty maintaining social function and marked difficulty maintaining concentration, persistence or pace. Dr. Merchant's opinion cannot be reconciled with the opinions of three other qualified experts in clinical psychology and psychiatry, a conclusion which does not help Plaintiff nor give credence to his argument that the ALJ erred in assigning less credibility to the treating physician. There is, however, an additional problem with Dr. Merchant's opinion and that is that it is not based on any form of testing, but merely based on mental status examinations. To be fair, the opinions of Drs. Sexton and Eggerman were also based on mental status examinations without the administration of any objective tests.

In our opinion, the ALJ was not required to give controlling weight to the opinion of Dr. Merchant because her opinion was inconsistent with the opinions of other mental health professionals and unsupported by any testing. It was also inconsistent with the GAF assigned by Dr. Merchant herself. The ALJ did not error in rejecting Dr. Merchant's opinion, notwithstanding her status as a treating source, as well as one with a longitudinal history with Plaintiff.

Plaintiff also assigns as error prejudicial to his case the fact that the ALJ assigned lesser weight to the opinions of Drs. Sudarshan, an examining and treating physician, and Dr. Koppenhoefer, an examining physician, and greater weight to the opinion of the Medical Expert, Dr. Lorber, who neither examined, nor treated Plaintiff, but reviewed his medical records. There is some degree of agreement, in terms of the restrictions or limitations to be imposed, between the opinions of Drs. Sudarshan and Koppenhoefer. Dr. Sudarshan is the specialist in pain medicine who administered the epidural injections of steroids to Plaintiff's low back. Dr. Koppenhoefer is a specialist in rehabilitative medicine and a physician who frequently serves as a medical consultant for governmental entities and insurance companies in disability cases. Both Drs. Sudarshan and Koppenhoefer agree that Plaintiff has the residual functional capacity to sit for 30 minutes at a time. While Dr. Sudarshan opined that Plaintiff could walk for two

19

blocks, Dr. Koppenhoefer's opinion was that Plaintiff could stand/walk for 30 minutes at a time. Dr. Sudarshan stated that Plaintiff could stand/walk for less than 2 hours in a workday, while Dr. Koppenhoefer said that Plaintiff could stand/walk for about 4 hours in a workday. Both agreed that Plaintiff would have to shift positions frequently as did Dr. Lorber, who didn't address the issue of the need to change positions directly, but limited Plaintiff to "intermittent" standing and sitting. Dr. Lorber is a board certified orthopaedic surgeon.

The lifting restrictions imposed by the two physicians are also quite similar. Dr. Sudarshan's opinion was that Plaintiff could frequently lift less than 10 lbs., occasionally lift 10 lbs., but never lift 20 lbs. or more. Dr. Koppenhoefer's view was that Plaintiff should rarely lift 20 lbs. The opinions of Drs. Sudarshan and Koppenhoefer are also in line with the opinion of Dr. Caldwell, who said that Plaintiff could lift 10 lbs. frequently and 20 lbs. occasionally. The two physicians' estimates regarding absences due to impairments and treatment are also quite similar. Dr. Sudarshan expected that Plaintiff would miss about 4 days per month, while Dr. Koppenhoefer's estimate was about 3 days per month. The significance is that the Vocational Expert provided un-rebutted evidence that missing 3 days per month would render Plaintiff unemployable.

Dr. Koppenhoefer expressed the opinion that Plaintiff met Listing 1.04 because he had functional limitations, even though he did not have either the motor loss or sensory reflex change required by the Listing. Dr. Lorber disagreed because Plaintiff was determined to be "neurologically intact" following his cervical surgery. Listing 1.04 requires "evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss accompanied by sensory and reflex loss, and if there is involvement of the lower back, positive straight-leg raising." Although there is evidence in Plaintiff's medical record of nerve root compression, limitation of motion and neuro-anatomic distribution of pain, there is no evidence of sensory or motor loss after the cervical surgery as shown by the MRI of March, 2005. The ALJ was justified in rejecting the opinion of Dr. Koppenhoefer that Plaintiff met Listing 1.04. The evidence clearly shows that Plaintiff did not meet the Listing.

The restrictions that Dr. Lorber imposed, limiting Plaintiff to light work and precluding overhead work because of Plaintiff's cervical stiffness and pain upon flexion and extension of

the neck, as well as crawling, excess vibration and climbing were all common sense restrictions.

Although the ALJ chose to afford "little weight" to the opinions of Drs. Sudarshan and Koppenhoefer, and "great weight" to the opinion of Dr. Lorber, we do not consider the various opinions to be miles apart once it is determined that Plaintiff did not meet Listing 1.04, except in one significant area. Both examining physicians agreed that Plaintiff would miss at least 3 days per month because of his symptoms and treatment to alleviate those symptoms. Dr. Merchant, the treating psychologist agreed. Dr. Lorber's testimony is silent on the subject. To the extent that the ALJ afforded "great weight" to an inference derived from Dr. Lorber's testimony that Plaintiff was employable and would not miss a total of 3 days per month, the ALJ committed error.

The next Statement of Error asserts that the ALJ gave inadequate consideration to Plaintiff's subjective reports of pain. A review of the ALJ's opinion in this case indicates that he questioned the Plaintiff's report of disabling pain in three areas: (1) Plaintiff's statements to his physicians, (2) the activities Plaintiff was able to perform and (3) the objective medical evidence. The ALJ indicated to his doctors that his pain was intermittent and helped by medications. Plaintiff was able to drive, operate a golf cart, use his HAM radio, play with his dogs and perform some household chores. Although he has an objective basis for pain and stiffness in his cervical and lumbar spine, he has neither sensory or motor loss except for some numbness on the inner left thigh and his subjective reports of pain led Drs. Sexton and Wagner to believe that he suffers from Somatoform Disorder. One cannot criticize the ALJ's determination that Plaintiff's subjective reports of disabling pain were somewhat disproved by any or all of the above factors.

The last Statement of Error relates to the ALJ's formulation of his hypothetical question to the Vocational Expert. Plaintiff asserts that the hypothetical question did not fairly represent him because it listed no limitations regarding his ability to sit or stand/walk, contained no limitations regarding his psychological impairments and ignored the un-rebutted opinion of Drs. Merchant, Sudarshan and Koppenhoefer regarding Plaintiff's projected absences due to his symptoms and treatment.

Because of Plaintiff's mental restrictions, the ALJ's hypothetical limited him to jobs with

21

simple instructions and those involving repetitive and routine tasks. Those limitations were suggested by both Drs. Sexton and Eggerman. Because of Plaintiff's difficulty dealing with stress and following the suggestion of Drs. Sexton, Koppenhoefer and Eggerman, the ALJ attempted to accommodate Plaintiff by limiting him to jobs with no production quotas and no assembly-line work. Because Plaintiff had some problems relating to social functioning, the ALJ restricted him to a stable environment with only occasional contact with co-workers and no contact with the general public.

But the hypothetical left out two restrictions well established in Plaintiff's medical record: (1) the fact that he would require frequent changes of position or posture to temporarily alleviate his cervical and lumbar pain and, more importantly, (2) the fact that he would miss 3 or more days per month because of his impairments and necessary treatment. The first point should not lead to an award of benefits, since we are quite sure that all the jobs located by the VE do permit alternate changes of position. However, substantial evidence supports the conclusion that Plaintiff will miss 3 or more days per month because of his impairments and had this fact been included in the hypothetical question, as it should have been, the VE's answer was that Plaintiff was unemployable.

## CONCLUSION

Lastly, the record clearly establishes disability in this matter. Both examining physicians, as well as Dr. Merchant, agreed that Plaintiff will miss at least 3 days per month because of his impairments and the treatment required. Based on this, the vocational expert testified that Plaintiff would be unemployable. (Tr. 336-348, 382). Because the record adequately establishes Plaintiff's entitlement to benefits and there is no significant evidence to the contrary, this matter should be remanded for an award of benefits. *See Felisky v. Bowen*, 35 F.3d 1027, 1041 (6th Cir. 1994); *Newkirk v. Shalala*, 25 F.3d 316, 318 (6th Cir. 1994); *Faucher v. Secretary of HHS*, 17 F.3d 171, 176 (6th Cir. 1994).

**IT IS THEREFORE RECOMMENDED THAT:**

This case be REVERSED pursuant to Sentence Four of 42 U.S.C. § 405(g) consistent with this opinion and remanded for an award of benefits.

June 5, 2008

Timothy S. Hogan
United States Magistrate Judge

23

## NOTICE TO THE PARTIES REGARDING THE FILING
## OF OBJECTIONS TO THIS R&R

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within ten (10) days after being served with this Report and Recommendation. Pursuant to Fed. R. Civ. P. 6(e), this period is automatically extended to thirteen (13) days (excluding intervening Saturdays, Sundays, and legal holidays) because this Report is being served by mail, and may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation are based in whole or in part upon matters occurring on the record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within ten (10) days after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See United States v. Walters,* 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).

24